GEORGE G. MGDESYAN (SBN 225476)
MGDESYAN LAW FIRM
4529 Sherman Oaks Avenue
Sherman Oaks, California 91403
Telephone (818) 386-6777
Facsimile (818) 754-6778
Email: george@mgdesyanlaw.com

Attorney for Defendant
FELIX CISNEROS, JR.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## —WESTERN DIVISION—

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 3:21CR00051-RGK |
| Plaintiff, | ) DEFENDANT'S OBJECTIONS |
| | ) TO THE PRESENTENCE |
| v. | ) REPORT AND SENTENCING |
| | ) MEMORANDUM; EXHIBITS |
| FELIX CISNEROS, JR., | ) |
| | ) Date: October 17, 2022 |
| Defendant. | ) Time: 10:00 a.m. |
| | ) |
| | ) HON. R. GARY KLAUSNER |

Defendant FELIX CISNEROS, JR., by and through his attorney of record, George G. Mgdesyan, hereby and herewith submits his Objections to the Presentence Investigation Report and his Sentencing Memorandum, with Exhibits.

The defendant's sentencing position is based on the attached memorandum and points and authorities, the exhibits attached hereto, the files and records in this case, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

Date:  October 5, 2022

Respectfully submitted,

MGDESYAN LAW FIRM


/s/ *George G. Mgdesyan*
GEORGE G. MGDESYAN
Attorney for Defendant
FELIX CISNEROS, JR.

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................1

I.    OVERVIEW AND RECOMMENDED SENTENCE .......................................1

II.   PROCEDURAL HISTORY ...............................................................................5

III.  DEFENDANT'S REMORSE .............................................................................7

IV.   COMMENTS ON THE ADVISORY GUIDELINES AND OBJECTIONS TO THE CALCULATION IN THE PSR ..................................8

       A.    Defendant's Objections to the PSR ............................................10

              i.    More than One Bribe or Extortion ...................................10

              ii.   Loss Amount .......................................................................12

              iii.  High-level Decision-making or Sensitive Position .........13

              iv.   Public Official Who Facilitated Entry Into The United States......14

       B.    Defendant's Recommended Guideline Calculations ...............15

       C.    Additional Guideline Factors for Consideration......................16

       D.    Objection to the Money Judgment………………………………..18

V.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITY MILITATES FOR A SENTENCE IN THE VICINITY OF 41 MONTHS .............................18

VI.   DEFENDANT'S HISTORY OF SERVICE TO HIS COUNTRY ARE LEGITIMATE GROUNDS FOR CONSIDERATION AND SUPPORT THE REQUESTED SENTENCE .................................................................................21

       A.    Military Enforcement Career .....................................................21

       B.    Law Enforcement Career ...........................................................22

i

# TABLE OF CONTENTS (con't)

Page

VII.   THE DEFENDANT'S POST OFFENSE CONDUCT AND LOW RISK TO
       RECIDIVATE FURTHER SUPPORT THE REQUESTED SENTENCE ....... 22

VIII.  DEFENDANT'S HISTORY AND CHARACTERISTICS FURTHER
       SUPPORT THE REQUESTED MITIGATED SENTENCE .......................... 24

       A.    Family Background and Upbringing................................... 25

       B.    Education/Adolescence ................................................. 27

       C.    Mother's Death ............................................................ 28

       D.    Marriage and Children .................................................. 29

IX.    THE FACTORS AT 18 U.S.C. §3553(a) AND THE CURRENT
       STATE OF THE LAW ARE IN CONFORMANCE
       WITH THE REQUESTED SENTENCE OF 41 MONTHS .......................... 32

       A.    Just Punishment .......................................................... 33

       B.    Deterrence ................................................................. 34

       C.    Societal Protection ...................................................... 36

       D.    Rehabilitation ............................................................. 37

       E.    Avoidance of Unwarranted Sentence Disparity ................... 38

X.     CONCLUSION ................................................................... 38

ii

# TABLE OF AUTHORITIES

**Page(s)**

## U.S. SUPREME COURT CASES

*United States v. Booker*, 543 U.S. 220 (2005).......................................................passim

*Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586 (2007) ....................................24,25

*Kimbrough v. United States*, 128 S. Ct. 558 (2007) ........................................................9

*Koon v. United States*, 518 U.S. 81 (1996).................................................................25

*Lauersen v. United States*, 543 U.S. 1097 (2005) .....................................................9, 16

*Pepper v. United States*, 131 S. Ct 1220 (2011) ......................................................25, 39

*Rita v. United States*, 127 S.Ct. 2456 (2007) .............................................................33

*Williams v. People of the State of New York*, 337 U.S. 241 (1949) ............................25

## CIRCUIT COURT CASES

*United States v. Lauersen*, 362 F.3d 160 (2d Cir. 2004) ................................................9

*United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) ....................................32

*United States. v. Sachsenmaier*, 491 F.3d 680 (7th Cir. 2007) ...................................33

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008).........................................32

## DISTRICT COURT CASES

*United States v. Adelson*, 441 F.Supp. 2d 506 (S.D.N.Y. 2006) ..............................3, 10

*United States v. Suarez-Reyes*, 2012 U.S. Dist. LEXIS 178771 (D. Neb. Dec. 18, 2012) ................................................................................................................................16

# TABLE OF AUTHORITIES (con't)

**Page(s)**

## STATUTES

8 U.S.C. § 1182(a)(2) ................................................................................................. 5

18 U.S.C. § 201(b)(2)(A) ........................................................................................... 6

18 U.S.C. § 204(a)(2) ................................................................................................. 5

18 U.S.C. § 216(a)(2) ................................................................................................. 5

18 U.S.C. § 371 ...................................................................................................... 5, 6

18 U.S.C. § 1001 ........................................................................................................ 5

18 U.S.C. § 1519 ........................................................................................................ 5

18 U.S.C. § 1956(a) ............................................................................................. 6, 15

18 U.S.C. § 3553(a) ........................................................................................... passim

18 U.S.C. § 3661 ...................................................................................................... 25

26 U.S.C. § 7206(1) ................................................................................................... 6

## U.S. SENTENCING GUIDELINES

§ 1B1.3 ....................................................................................................................... 6

§ 2A1.5 ..................................................................................................................... 17

§ 2A2.1 ..................................................................................................................... 17

§ 2A4.1 ..................................................................................................................... 17

§ 2B1.1 ............................................................................................................. passim

§ 2B3.1 ..................................................................................................................... 17

iv

# TABLE OF AUTHORITIES (con't)

**Page(s)**

§ 2C1.1 ...............................................................................................................passim

§ 4A1.2 ............................................................................................................... 6

## U.S. SENTENCING COMMISSION STATISTICS AND SURVEYS

U.S.S.C., Quick Facts, Bribery Offenses (Fiscal Year 2021), available at:
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-
facts/Bribery_FY21.pdf ............................................................................... 17

U.S.S.C., Statistical Information Packet, Central District of California (Fiscal Year
2021), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-
publications/federal-sentencing-statistics/state-district-circuit/2021/cac21.pdf .......... 18

## EMPIRICAL DATA AND OTHER SOURCES

Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485 (1998),
available at:
https://heinonline.org/HOL/LandingPage?handle=hein.journals/siulj23&div=32&id=
&page= ............................................................................................................ 36

Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67 (2005), available at:
https://www.jstor.org/stable/40040252 ...................................................... 36

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.
## OVERVIEW AND RECOMMENDED SENTENCE

Following his release from custody in November 2019 from the sentence imposed by Hon. Christina Snyder on the previous (and closely related) indictment in Case No. 17-CR-00229-CAS, Mr. Cisneros was gainfully employed and spent the majority of his time working. When he was not at his job, he spent his time with his wife and three young adult children. Mr. Cisneros has not been involved in any type of criminal activity in the past 5½ years -- since prior to his arrest on the original indictment -- and he has a lengthy and solid track record to prove his rehabilitation.

While Mr. Cisneros was charged in February 2021 in the instant federal indictment, Case No. 21-CR-00051-RGK, alleging additional crimes, the offense conduct was not new criminal activity. Rather, the allegations date to the period of September 2015 through March 2017, prior to Mr. Cisneros' arrest on the original case on March 22, 2017, and are now all at least 5½ years old. In the interim, Mr. Cisneros was convicted in the first case, sentenced to a year and a day in prison, served his prison term, came out, obtained a job, resurrected his relationship with his spouse and children, and led a thoroughly law-abiding life. Simply put—and it warrants emphasis—this is not the case of an individual who violates the law, goes to prison, and comes out to commit new crimes.

The Presentence Report (hereinafter, "PSR") prepared by the United States Probation Office in this case has calculated advisory guidelines based on a series of

- 1 -

overlapping, repetitive specific offense characteristics.  Cumulatively, these would yield a wildly inflated guideline range that corresponds to a draconian term of imprisonment, far higher than needed to serve the ends of justice.  Other than the events that give rise to this prosecution, Mr. Cisneros has led a useful and productive life.  He served his country honorably in the military, followed by a long career safeguarding our nation with the United States Border Patrol and Homeland Security Investigations.

In the PSR, the Probation Officer notes the following:

> Among the factors that the Court shall consider in determining the particular sentence are the history and characteristics of the defendant.  Cisneros's nature and characteristics may warrant a sentence outside of the advisory guideline system.  Specific considerations are that Cisneros served more than two years in the Army Service and earned an honorable discharge, his career spanning more than two decades in public service, his family ties and responsibilities, his post-offense rehabilitation and employment, and his low possibility for future recidivism.

PSR, p.27, ¶147.

We urge the Court to see Felix Cisneros for the decent man he is, and as someone deserving of compassion and mercy.  The Probation Officer's view expressed in the PSR is that the Guidelines offense level applicable to Mr. Cisneros should be Level 32.  While the Probation Officer acknowledges that the guidelines are now merely advisory, we believe strongly that the facts of this man's life warrant, at most, a limited prison term.  Years of incarceration and all that go along with it—in

Felix Cisneros' case, separation from his wife and three children—would be disproportionate to Mr. Cisneros' actual conduct and to the otherwise good life he has led.

A sentence informed solely by arithmetically-driven guidelines, as the government endorses, could lead to a result for Mr. Cisneros that is irrationally punitive. The government's proposal of a prison term of 12 years for Mr. Cisneros -- beyond even the 10-year mandatory minimum penalties that exist for high-level narcotics traffickers—is vastly excessive and simply defies logic.

The situation presented here is not incongruous with that faced by a judge on the East Coast, the Honorable Jed S. Rakoff in *United States v. Adelson*, 441 F.Supp. 2d 506 (S.D.N.Y. 2006). In *Adelson*, a securities fraud case, the government initially urged the court to sentence the defendant to a Guidelines sentence based on an offense level of 55. Ultimately, "[e]ven the Government blinked at this barbarity." *Id.* at 511. Judge Rakoff observed that such an offense level was "normally only seen in cases involving major international narcotics traffickers, Mafia dons, and the like. How could it possibly apply here?" *Id.* at 509. Just as in *Adelson*, the answer here is a resounding "it cannot." Imposing a steep prison term may be appropriate in massive bribery offenses involving tens or hundreds of millions of dollars, or matters that pose a particularly egregious threat to national security. But Felix Cisneros, who has worked hard all his life serving his country and has no other criminal history, is not even remotely in that category.

The professional and personal collateral punishments already imposed and still awaiting Mr. Cisneros and his family as a result of his involvement in this offense continue to be harsh. The family has not only been financially impacted, but has suffered palpable psychological strain for a period now surpassing five years.

Another salient factor for this Honorable Court's consideration is the amount of time that has passed since commission of the criminal acts for which Mr. Cisneros has been convicted, all of which had ended by March 2017. The fact that so many years have interceded without return to any form of misconduct by Mr. Cisneros suggests that he does not pose a danger to anyone and prolonged incarceration is not required for the sake of societal protection. Quite the opposite, Mr. Cisneros' conduct in recent years has been entirely positive, defined by a return to the workforce to support his family. His ability to follow instructions and to remain law-abiding have been demonstrated by his compliance while previously under the supervision of U.S. Pretrial Services and the United States Probation Office, with no negative incidents of any type, as well as his time in BOP custody where he has been a model inmate.

While it is understood that none of these factors can altogether offset the criminal acts for which Mr. Cisneros stands convicted or the requirement for some form of punishment, they are instructive about his personal nature as well as the type and length of punishment that may be most appropriate in this case. We believe that leniency is warranted in light of Mr. Cisneros' personal history and characteristics,

- 4 -

and the passage of more than half a decade since the offending transgressions

occurred.

For the reasons discussed in the Sentencing Memorandum, it is respectfully

requested that this Court impose a sentence not greater than 41 months, to be reduced

by one year and one day, to account for the custodial time already served on the prior,

but related case -- yielding a total sentence to be imposed on the instant case of 29

months imprisonment.

## II.
## PROCEDURAL HISTORY

On April 23, 2018, Felix Cisneros, Jr. was convicted of: (1) conspiracy to aid

and assist an inadmissible alien who had been convicted of an aggravated felony to

enter the United States in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1182(a)(2); (2)

acting as an agent of another before a department, agency, or officer in a covered

matter affecting the United States in violation of 18 U.S.C. §§ 204(a)(2), 216(a)(2);

(3) knowingly making a false entry in a record or document with the intent to impede,

obstruct, or influence the investigation of a federal matter, in violation of 18 U.S.C. §

1519; and (4) knowingly and willingly making a false, fictitious, or fraudulent

statement in a matter within the jurisdiction of the executive branch, in violation of 18

U.S.C. § 1001.  Case No. 2:17-cr-00229-CAS.  As a result, on November 5, 2018, Mr.

Cisneros was sentenced to 12 months and 1 day in custody followed by one year of

supervised release which he performed without incident.

On August 31, 2020, the Ninth Circuit vacated Mr. Cisneros' conviction

for acting as an agent of another before a department, agency, or officer in a covered matter affecting the United States, citing insufficiency of evidence to support a conviction. ECF No. 159.  Mr. Cisneros then appeared before the Court for resentencing on the remaining counts.  On May 10, 2021, Mr. Cisneros was sentenced to time served on Counts 1, 3, and 4 of the First Superseding Indictment.

On February 16, 2021, Defendant Felix Cisneros was indicted again for related and overlapping offense conduct, charging him with:  Count 1: Conspiracy to Commit Bribery of a Public Official, in violation of 18 U.S.C. § 371; Count 2:  Bribery of a Public Official, in violation of 18 U.S.C. § 201(b)(2)(A); Counts 3 through 28: Money Laundering, in violation of 18 U.S.C. § 1956(a); and Counts 29 and 30: Subscribing to a False Tax Return, in violation of 26 U.S.C. § 7206(1).  On May 3, 2022, Mr. Cisneros was found guilty by jury trial on each of the above counts.

In the PSR which was disclosed on August 15, 2022, the Probation Officer notes that pursuant to U.S.S.G. § 4A1.2, Application Note 1, a prior sentence means any sentence imposed prior to sentencing on the instant offense—other than a sentence for conduct that is part of the instant offense.  Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under U.S.S.G. § 1B1.3.  Relevant conduct includes behavior that is part of a common scheme or plan or the same course of conduct.  Because the conduct giving rise to the previous conviction is part of the same common scheme and plan and course of conduct giving rise to the instant offense, the earlier conviction does not result in the

addition of criminal history points. PSR, pp.17-19, ¶85.  The Probation Officer finds that Mr. Cisneros' first criminal conviction from 2017 is relevant conduct and determines that he has a criminal history score of 0, Criminal Category I. PSR, p.19, ¶87.  By the same token, Mr. Cisneros has already served 12 months and 1 day of custodial credit that should be applied to his sentence in the instant case and warrants a downward departure or variance so that he is not punished twice for the same conduct. PSR, p.27, ¶146.

## III.
## DEFENDANT'S REMORSE

Defendant Cisneros' contrition is clear to anyone who knows him.  He is distraught over the fact that he has betrayed the trust of his fellow law enforcement officers and those who know him best and looked up to him.  He also deeply regrets the harm that his wrong decisions have caused his family.  Individuals close to Mr. Cisneros, who have written the Court on his behalf (letters attached), share their observations of the impact this event has had on him and his family.

Ricardo Villagrana writes:

> Felix works hard for his family, and working seven days a week didn't matter to him, as long as he could provide and give them the opportunity to focus on their goals to be successful in life.  Felix has always set a good example for family and shown them that hard work and focus does pay off.  Although they work as a team, Felix is heavily involved with guidance, planning, and teaching, not only for his wife and kids, but for friends, family, and even strangers.  I've seen the impact this case has caused on Felix and his family and I know how

devastating and life changing it would be for them to be apart.

And Ceasar Decasas, Mr. Cisneros' brother-in-law, notes in his letter:

> The court proceeding has impacted him completely and devastated us all. Knowing Felix almost my whole life and knowing how hard he has worked, how dedicated and great of a guy he is, it is unfortunate that he is in this situation. He, of all people, would have never thought to be experiencing this makes me upset. Felix has learned a lot going through this. He lost his career, had to experience incarceration, and is being separated from his family. I know whatever set back he is given he will move forward because of the support he has. Felix loves his family. There isn't a decision he would make that would jeopardize everything he has lost and put his family in the situation they are in. A prolonged sentencing would affect them all emotionally. He is the rock of the family. His kids are growing, all in college and working. My sister not having her husband and my nieces and nephew not having their dad is heartbreaking. This is also how many of us feel. I cannot imagine him being away longer than he has. I do hope compassion is given. He is not a bad person or a threat.

## IV.
## COMMENTS ON THE ADVISORY GUIDELINES AND OBJECTIONS TO THE CALCULATION CONTAINED IN THE PSR

While the guidelines are now only advisory, a sentencing court is required to consult them. The recommended offense level of 32 contained in the PSR far overstates offense culpability as it pertains to Felix Cisneros' participation. In the matter at bar, the amount of money that figures in the credit card installment payments is not particularly large for a Federal bribery case. Even using the highest dollar

figure that has been propounded by the Government (which the defendant contests), the benefit to be received still does not reach $150,000.  This contrasts with the recent bribery cases involving the Los Angeles Department of Water and Power (LADWP) being adjudicated in this same courthouse where the benefit to be received was over $30 million -- more than 200 times the dollar amount involved in this case.  Nevertheless, Mr. Cisneros fully acknowledges that mistakes were made and he deeply regrets his actions and misjudgments that have brought him to this juncture.

Adding the three separate specific offense characteristics computed by the Probation Office, on top of the distorted 8-level increase derived from loss amount, §2B1.1(b)(1)(I), would vastly skew Mr. Cisneros' guidelines.  The resulting overall Guidelines calculation in the PSR has become unhinged from the now-established first principle of sentencing: that the sentence imposed be "sufficient, but not greater than necessary to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  Sentencing courts have recognized "that when the addition of *substantially overlapping enhancements* result in a significant increase in the sentencing range minimum, a departure may be considered."  *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (emphasis in original) (*Lauersen II*), *vacated, Lauersen v. United States*, 543 U.S. 1097 (2005).

A sentencing court's authority "to reject…the advice of the Guidelines," *Kimbrough v. United States*, 128 S. Ct. 558, 577 (2007)(Scalia, J., concurring), has particular relevance here.  The § 2B1.1 loss table is a blunt instrument ill-suited to the

wide range of financial crimes to which it applies.  Moreover, "the guidelines' fetish with abstract arithmetic" fails to take account of the devastating effect "that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006).

The defendant, through counsel, asks the Court to consider the following:

**A.    Defendant's Objections to the PSR**

The defendant disagrees with the Offense Level Computations (Specific Offense Characteristics) in the PSR, as detailed below:

**i.    More than One Bribe or Extortion**

Pursuant to U.S.S.G. § 2C1.1, subsection (b)(1) provides for an increase for offenses involving multiple acts of bribery.  However, Application Note 2 clarifies: "Related payments that, in essence, constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe, or extortion, even if charged in separate counts."

Here, Mr. Cisneros received a number of checks or installments totaling $93,403.  This cumulative amount should constitute a single action and not be counted as 40 separate bribes, since every check was intended to pay down Felix Cisneros' credit card debt and was part of the same larger agreement or transaction.  Mr. Cisneros did not perform an official act, such as conducting law enforcement queries or creating alerts, every time that he received a check.  The initial agreement was for E.S. to pay the entire debt on Cisneros' credit cards, which totaled approximately

$93,000.  The fact that E.S. did so in installment payments does not constitute multiple bribes under U.S.S.G. § 2C1.1(b)(1).

Furthermore, the government contends that an additional cash payment of $40,000 was made by E.S.  See loss argument, below.  However, the only evidence presented at trial was the testimony of E.S. that he gave the money to J.B., who, in turn, verbally told E.S. that he had given it to Cisneros.  J.B. did not testify at trial and thus E.S.' testimony was not corroborated and does not preponderate for a finding of an additional bribe payment. Moreover, on September 14, 2022, the Government disclosed information concerning its key witness, E.S., including that E.S. admitted he had committed other crimes in the past. In a letter produced by the prosecutor a few days before Cisneros' previously scheduled sentencing date, it was acknowledged that E.S. was not a licensed attorney – in direct contradiction to his sworn testimony under oath at Mr. Cisneros' trial -- and he had paid H.M. $140,000 to study and take the California Bar Exam for him. See Letter dated 9/14/22 from AUSAs Pinkel, Morse and Rodriguez, attached hereto as Exhibit B. In addition, E.S. admitted that he had been involved in identity theft and criminal credit card fraud at his law firm, Pillar Law Group. E.S.' testimony was material to—and indeed the *only* evidence—establishing the cash payments. Based on the plethora of false statements to which he testified under oath at the trial, there is every likelihood that E.S. also lied to the jury when he testified that he gave cash to J.B who in turn gave it to Cisneros.

In any event, E.S.' credibility is virtually nil and Mr. Cisneros' guidelines should not

be further elevated based on E.S.' wholly uncorroborated assertions.

It is crucial to note that Counts Twenty-Nine and Thirty (filing false tax returns)

do not include this additional cash payment amount. The government's trial exhibit

referenced cash payments in a somewhat different amount. See Govt's Application

for Entry of Money Judgment, dkt. no. 117. These actions further demonstrate the

unreliability and insufficiency of evidence with respect to the alleged cash payment.

Accordingly, the 2-level increase at § 2C1.1(b)(1) should not be applied.

### ii.    **Loss Amount**

Pursuant to U.S.S.G. § 2C1.1(b)(2), "Loss," for purposes of subsection (b)(2),

shall be determined in accordance with the Commentary to § 2B1.1 (Theft, Property

Destruction, and Fraud). The value of "the benefit received or to be received" means

the net value of such benefit.

Here, Mr. Cisneros received an aggregate amount of $93,403 in payments and

not $143,000. Between September 2015 through late 2016, he received checks

totaling $93,403. The amount of $143,000 includes an alleged cash payment given to

J.B. Yet there was no evidence presented whatsoever at trial that Mr. Cisneros was

even aware of the cash given to J.B., much less that any of it was actually forwarded

along to Mr. Cisneros. Moreover, at trial, there was conflicting testimony by E.S.

whether he had given $30,000 or $50,000 to J.B. And J.B. did not testify to

corroborate whether Cisneros ever received any of the cash allegedly provided by

- 12 -

E.S., or knew about these cash payments to J.B.  The only evidence was E.S.' self-serving testimony that he gave J.B. an imprecise amount of cash that he no longer clearly remembered and that J.B. later claimed that he had given that cash to Mr. Cisneros.  E.S. testified that he never confirmed with Mr. Cisneros whether he, in fact, received those funds from J.B. Thus, this evidence does not remotely comply with the preponderance of the evidence standard needed to increase the loss amount. All the more so because, in light of the Government's recent revelations, E.S. is not a credible witness. E.S. lied to the jury that he was a licensed attorney. He concealed from the Government, as well as the jury, his ongoing involvement in credit card fraud as well as other major crimes. With this pedigree of disregard for the truth and willingness to commit perjury, he could very well have lied about giving the cash payments to J.B. Absent any other proof or support, those alleged cash payments should be excluded from the loss calculation.

At a loss amount of $93,403 the offense level should be increased by 6 levels and not 8, per U.S.S.G. §2B1.1(b)(1)(D).

### iii.    <u>High-level Decision-making or Sensitive Position</u>

Pursuant to U.S.S.G. § 2C1.1(b)(3), Application Note 4 – "High-level decision-making or sensitive position" means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process.

- 13 -

Here, although Mr. Cisneros was a special agent for the Department of
Homeland Security, he was not aware that the parole letter was for E.S.' brother-in-
law until after the letter was sent. At trial, E.S. lied to the jury about being a licensed
attorney among other things, E.S. could easily have lied to Cisneros about who he
needed the parole letter for.  Again, E.S.' testimony was the only evidence of the
criminality of the parole letter.

As a law enforcement officer, Mr. Cisneros had worked in conjunction with
J.B. from the Glendale Police Department on several narcotics investigations. J.B. told
Mr. Cisneros that the parolee D.K. was an informant and that he needed help getting
him into the United States because it was too dangerous for D.K. to remain in Tijuana,
Baja California.  J.B. expressed to him that the informant was in great jeopardy and
that it was an urgent matter, so Cisneros agreed to provide the parole letter.
Moreover, the Glendale Police Department would be responsible for D.K's
supervision, and not Cisneros.  The parole letter was sent as a request in support of an
ongoing investigation by the Glendale Police Department and not the Department of
Homeland Security.

Therefore, the 4-level increase at subsection (b)(3) should not apply here, since
Mr. Cisneros was not acting in a "high-level decision-making position" when he
issued the parole letter at the request of J.B. who was also a law enforcement officer.

- 14 -

### iv.    Public Official Who Facilitated Entry Into The United States

Pursuant to U.S.S.G. § 2C1.1(b)(4), if the defendant was a public official who facilitated (A) entry into the United States for a person, a vehicle, or cargo; (B) the obtaining of a passport or a document relating to naturalization, citizenship, legal entry, or legal resident status; or (C) the obtaining of a government identification document, increase by 2 levels.

Here, Mr. Cisneros did not facilitate D.K.'s entry into the United States.  Nor did he have authority to issue an order to facilitate such entry.  The parole letter is simply a request. E.S.' testimony about the parole letter has less weight now that he has admitted to lying to the jury about being a licensed lawyer.  Moreover, the request was denied, and D.K. did not enter the U.S. based on that avenue of relief.  It was revealed at trial that D.K. later gained entry to the U.S. after he applied for asylum and he was being held at an immigration detention center in Louisiana while the asylum petition is adjudicated.  Thus, the parole letter was not the means of D.K.'s entry into the United States.

### B.    Defendant's Recommended Guideline Calculations

According to the defendant's guideline calculations for Group 1: (Counts 1-28 Bribery of A Public Official/Money Laundering) a base offense level 14 [U.S.S.G. § 2C1.1(a)(1)] should be applied, with an increase of 6 levels for the loss [U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(D)], plus a 2-level increase since Mr. Cisneros was convicted under 18 U.S.C. § 1956(a).  These guideline calculations result in a Total

Offense Level of 22, with a sentencing range of 41-51 months.  The greater of the

adjusted offense levels would be level 22, and not 32.

With respect to the application of "substantially overlapping enhancements

[that] result in a significant increase in the sentencing range minimum," the Appellate

Court's holding in *Lauersen, supra,* is particularly germane here.  The four specific

offense characteristics that have been applied in the PSR calculation result in a

cumulative increase of ten levels, thus nearly tripling the low end of Mr. Cisneros'

advisory guidelines from 41 months to 121 months.  Given the circumstances not only

of the offense conduct but also of Mr. Cisneros' overall life and record of service, we

respectfully believe that such a draconian increase would be excessive and militates

for remediation through a departure or variance, yielding a sentence outside of the

advisory guideline system.

## C.    Additional Guideline Factors for Consideration

Due to the complexity of financial crime cases, courts routinely consider

whether the amount of Guidelines loss overstates the defendant's culpability,

warranting a downward departure.  *See, e.g., United States v. Suarez-Reyes*, 2012 U.S.

Dist. LEXIS 178771, at *18, *21 (D. Neb. Dec. 18, 2012) (finding application of a 14-

level loss enhancement would "exaggerate [defendant's] culpability and would not be

an accurate measure of his blameworthiness," and applying a downward variance).

In this case, Mr. Cisneros respectfully submits that the Court should grant a

significant downward variance.  This was a serious offense and nothing in this

sentencing memorandum or any of the papers filed on behalf of Mr. Cisneros in

connection with sentencing is intended to suggest otherwise.  Nevertheless, the actual

benefits received by Mr. Cisneros consisted of numerous checks provided to him

monthly which were made payable to the credit card companies for payments on Mr.

Cisneros' credit cards.  Mr. Cisneros did not receive substantial cash payments or gifts

in exchange for conducting database queries for J.B. at the request of E.S.  Mr.

Cisneros felt that he had a close personal friendship with J.B. and that these queries

were for targets that were part of J.B.'s own law enforcement investigation.  In reality,

and without attempting to absolve him of culpability, Mr. Cisneros was in some sense

taken advantage by J.B. and E.S. who were the ones receiving the greatest benefit.

To the extent that the Guidelines are anywhere near the vicinity of Total

Offense Level 32, their advice should be rejected.  Essentially, the Guidelines would

be advising this Court to punish Mr. Cisneros similar to defendants convicted of

discharging a firearm during a bank robbery where the victim sustained bodily injury,

see § 2B3.1(a), (b)(1), (b)(2)(A), (b)(3)(A), Total Offense Level 31; and more

severely than defendants convicted of Conspiracy to Commit Murder (§ 2A1.5; Total

Offense Level 30); Attempted Murder (§ 2A2.1; Total Offense Level 30); or

Kidnapping (§ 2A4.1; Total Offense Level 29).  Offense level 32 should be reserved

for the most violent and/or recidivist offenders. This is not such a case.

Indeed, judges are increasingly sentencing well below the Guidelines in bribery

cases.  In 2021, Federal judges imposed "Within Range" sentences in only 20.9% of

bribery prosecutions.  U.S.S.C., Quick Facts, Bribery Offenses (Fiscal Year 2021), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Bribery_FY21.pdf. Nearly half the offenders received a downward variance on average of 56.8% of the sentencing range. Id. Moreover, the mean of all the sentences imposed for bribery/corruption cases in the Central District of California was six months. See U.S.S.C., Statistical Information Packet, Central District of California (Fiscal Year 2021) at Table 7, p.11, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/cac21.pdf.

**D.    <u>Objection to the Money Judgment</u>**

E.S.' new admission also impacts the Government's request for a money judgment. E.S.' testimony is the sole evidence that Cisneros received $40,000 in cash payments. The Government includes the $40,000 in its money judgement request. Based on E.S.' new revelation that he was not legitimately an attorney -- and that he had lied prior to, during, and after his testimony -- the money judgement request should not include the alleged cash amount of $40,000.

**V.**

<u>**THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITY MILITATES FOR A SENTENCE IN THE VICINITY OF 41 MONTHS**</u>

An ostensible purpose of the Sentencing Reform Act of 1984 was to provide a correction to sentencing disparities that existed between different federal courts and districts.  However, in practice, the Act's mandate to strictly adhere to the sentencing

- 18 -

guidelines diluted and often conflicted with the § 3553(a) requirement to avoid unwarranted sentence disparities. *United States v. Booker*, 543 U.S. 220 (2005) and its progeny have rectified this apparent contradiction.  Judges once again have authority to determine an appropriate sentence after due consideration of the totality of factors present in a particular case.  In this environment, determination of relative culpability and the need to avoid unwarranted sentencing disparity among similarly situated defendants have become increasingly important.  If the Sentencing Reform Act intended to correct and avoid sentencing disparities between different districts, or between different courts in the same district, then this intent should most certainly apply to co-defendants in the same case.

Among the defendants in this case, the offense conduct of J.B. appears to have been most proactive and hands-on with E.S.  In fact, J.B. was also a law enforcement officer and he would bring or convey checks and pass on messages from E.S. to Mr. Cisneros.  E.S. purported himself to be an attorney who engaged in much more serious criminal conduct and was associated with a criminal organization. E.S.' illegal activities expanded to include perjury under oath at a jury trial.

Mr. Cisneros began working with J.B. as part of a joint narcotics task force effort numerous years before the offense conduct began.  Prior to meeting J.B., Mr. Cisneros had never engaged in any sort of illegal conduct.  J.B. had the relationship with E.S. and eventually introduced him to Mr. Cisneros.

J.B. had connections to individuals within various organized crime groups including a gang member who was later indicted on racketeering charges.  Mr. Cisneros did not have connections to any organized crime groups, nor did he engage in any illegal activity approaching the level at which J.B. and E.S. operated.  J.B. was sentenced to 21 months with a fine of $95,000.  The guideline range as computed in the PSR for Mr. Cisneros for Level 32 is, at its low end, 100 months above J.B.'s sentence (six times as high).  E.S. is still awaiting sentencing.

Given that their offense conduct and culpability is similar, and their law enforcement backgrounds are similar, there is no basis to support such a significant gap in the sentence that was imposed on J.B and the sentence to be imposed on Felix Cisneros.  The interest of parity with the related defendants supports a sentence of no more than a 41-month term of imprisonment.

Similarly, in a sampling of recent cases involving bribery or serious financial crimes, the sentences that were imposed in those matters highlight the disproportionality of the government's request for a 10-12 year prison term for this defendant.  The government obliquely argues that a sentence within the guideline range cures any disparities.  However, the case of David H. Wright should be considered by this Court.  See 2:21-CR-559-SB.  Wright was sentenced to 72 months for a conspiracy involving $30 million in non-competitive, non-bid contracts to be awarded in exchange for massive payments.  These hidden costs would ultimately have been passed on to the ratepayers of LADWP.  The government had

recommended a sentence of 97 months, three years of supervised release, and a

$100,000 fine, despite a total offense level of 33 and a sentencing range of 135-168

months.  Dkt. No. 38 at 2; 10.  A co-defendant in a related investigation and

prosecution stemming from the same massive, multi-million dollar bribery scheme,

David Alexander, was sentenced to 48 months.  See 2:21-CR-572-SB.

Even more recently, on September 6, 2022, Robert Louis Cirillo was sentenced

to 78 months in prison and ordered to pay restitution of nearly $4 million.  Cirillo

operated a long-running "affinity fraud" scheme which targeted more than 100

victims, most of them low-income Hispanics, in a securities fraud plot.  See 8:22-CR-

77-DOC.  In addition, he engineered a "grandparents scam" that tricked an 82-year-

old victim to send $400,000 under false pretenses out of concern for the victim's

grandson.

Also last month, a Transportation Security Administration (TSA) officer,

Ronald McCrea, was sentenced to 27 months in Federal prison after pleading guilty to

accepting bribes in exchange for allowing large quantities of fentanyl and

methamphetamine to be smuggled through airports.  See 2:22-CR-186-JAK.

This brief sampling shows, on a visceral level, the disparity that would be

represented by a sentence in the 10-12 year range for this defendant, given his

background, past contributions, and lack of prior criminal history.

# VI.
# DEFENDANT'S HISTORY OF SERVICE TO HIS COUNTRY ARE LEGITIMATE GROUNDS FOR CONSIDERATION AND SUPPORT THE REQUESTED SENTENCE

## A.    Military Enforcement Career

Felix Cisneros joined the United States Army in 1993.  While in the Army, he attended Ranger school, an intensive mentally and physically challenging course which required him to undergo grueling training.  Although he did not complete the U.S. Army Ranger School, Mr. Cisneros did become an airborne parachute trooper. He also qualified for handling ongoing combat operations.  He completed all the pre-Ranger programs and he needed 25 days to finish Ranger school when he decided not to re-enlist in the Army because he had applied to be an agent with the U.S. Border Patrol.  Mr. Cisneros served in the Army from 1993 to 1996.

## B.    Law Enforcement Career

Following his Honorable Discharge, Felix Cisneros received six months training at the academy for Border Patrol agents at the Federal Law Enforcement Training Center.  From 1996 to 2007, Felix was a border patrol agent, first with U.S. Customs and then, after the sweeping government reorganization in the wake of the 9/11 attacks, with Customers and Border Protection ("CBP").  He was also a law enforcement firearm instructor in 2005-2006.  In 2007, he returned for another six months for ICE Special Agent training.  He also attended undercover school and narcotics trainings.  He continued his dedication to law enforcement and he was a

Special Agent for Homeland Security Investigations ("HSI") from 2007 to 2017. He left HSI due to the instant offense.

In his 20 years in law enforcement, Felix was dedicated to protecting individuals even when placing his own safety at risk. He was an undercover narcotics officer for many illegal drug investigations throughout the United States. He executed countless search warrants and arrests. He took hundreds of criminals off the street, and his actions contributed to the seizure of thousands of kilos of illegal drugs that were intercepted before they reached the public. He risked his life every day that he put on his uniform. Felix received numerous recognitions and awards throughout his law enforcement career.

## VII.
### THE DEFENDANT'S POST OFFENSE CONDUCT AND LOW RISK TO RECIDIVATE FURTHER SUPPORT THE REQUESTED SENTENCE

Upon his release in November 2019 from his prison term for the previous and related case, Felix went to work for GT Energy in Commerce, California as an account manager. On March 2, 2020, he was arrested and subsequently released on bond on the instant charges. During the time that he was on Supervised Release for the related offense, and under Pre-Trial release for this offense, Felix never engaged in any type of questionable or illegal activity. Quite the contrary, there is every indication that he has learned from this experience and has taken steps to right his path. He has stabilized and he has been steadily and legitimately employed as an

- 23 -

account manager for GT Energy since 2019.  He was living with his wife and three
adult children in their family home in Murrieta.

While it does not entirely obviate the need for some form of punishment to be
implemented, the fact that Felix Cisneros has done so well under Supervised Release
and Pre-Trial supervision augurs well for his future adaptation once he has served his
term of incarceration and returned to the community.  It also diminishes the need for
an overly long sentence for either purposes of incapacitation/public safety, or specific
(individual) deterrence of this defendant from reengaging in criminal activity.  There
is every indication that he is already been deterred, specifically since he has already
served a term of 12 months and 1 day for the same closely-related offense conduct,
and his life has been a model of propriety ever since.

It cannot be emphasized enough that the entirety of illegal conduct attributed to
Mr. Cisneros occurred prior to March of 2017, at least 5½ years ago.  In the
intervening years, he was charged in the first case and convicted; served his
punishment; was released and set about reconstituting his life; and never -- even by
the government's account -- returned to any form of illegality.  The long hiatus
between commission of the offense and this latest prosecution is difficult to explain.
It is certainly not due to any evasive or obstructive behavior by Defendant Felix
Cisneros.  He did not attempt to flee the jurisdiction, go underground or "on the lam."
He lived openly with his family and did his best to lead a normal and productive life
in spite of the handicap of having been convicted of a felony in the original case.

There is no question that Felix Cisneros has matured and grown as a person in the process. This man has learned from his mistakes and is committed to leading a completely law-abiding life as he moves forward.

## VIII.
### DEFENDANT'S HISTORY AND CHARACTERISTICS FURTHER SUPPORT THE REQUESTED MITIGATED SENTENCE

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all of the 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." *Gall* at 596-597.

Furthermore, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Pepper v. United States*, 562 U.S. 476 (2011), *quoting Koon v. United States*, 518 U.S. 81, 113 (1996). The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" *Id.* at 1240, quoting *Williams v. People of the State of New York*, 337 U.S. 241, 247 (1949). The Supreme Court has "emphasized that [h]ighly relevant—if not essential—to the selection of an

appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

In keeping with the above, the following social history information regarding Felix Cisneros is presented to the Court in the spirit of 18 U.S.C. § 3661, which states that "no limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

## A. **Family Background and Upbringing**

Felix Cisneros, Jr. was born on April 16, 1974 in Los Angeles, California.  His father, Felix Cisneros, Sr., is now 80 years old and resides in La Puente, California. Felix, Sr. worked for a commercial cleaning business where he specialized in stripping and waxing floors for various office buildings.  Eventually, Felix, Sr. became an independent contractor for the same commercial cleaning company, Skyline Building Services, until he retired.  The defendant's mother, Maria Guadalupe Cisneros, now deceased, did night cleaning and janitorial work at banks for the same company as her husband.  Maria worked full-time throughout Felix's childhood and would sometimes take him to work with her in the evenings so he could help out and she could watch him at the same time.  Maria worked until Felix was a freshman in high school.  Felix, as well as his family members, report that he had a good relationship with both parents.

- 26 -

In an appended letter, the defendant's goddaughter and cousin-in-law, Lizette Vargas notes:

> Felix like his father has always been a strong example to our family… His father carries the same strong values and so did his mother when she was on this earth. His parents exemplified Felix to be the great person he is today. I recall Holidays where his parents would bring foster kids to our holiday celebration, always treating the children with so much love and care.

Felix has one sister, Heydee Cisneros, age 51, who is a pathology technician for Kaiser Permanente in Los Angeles. Heydee is not married and she lives with their father in La Puente, California. She confirms that their parents were loving, supportive and hard-working. Felix played baseball from the age of eight until his first year of college. He was on travel teams and his mother would usually drive him from one game to another. Felix was also trumpet player for his school band and his parents tried to attend all of his performances.

In her letter, Haydee Cisneros notes:

> My brother and I have had a very close relationship most of our lives with the exception of when he served in the U.S. Army and resided in a different state as well as when he was assigned to the Border Patrol Academy and subsequently to the ICE Academy in Georgia.
>     I have seen many aspects of my brother's personality and throughout the years I have always found him to be smart, dependable, fair, responsible, trustworthy, loyal and very well regarded among his peers. He is a great and loving and providing husband and father to his family. He always wants the best for all of them.

Once Felix and his sister graduated from high school and were out of the home, his parents rededicated their child-rearing skills to providing a safe and loving home to foster children for the State of California.  By then, Felix had joined the U.S. Armed Forces.

**B.    Education/Adolescence**

Felix attended schools in the Hacienda-La Puente Unified School District.  His parents purchased their home in La Puente in 1972 and they never relocated.  As a child, Felix, Jr. did well in school.  In the elementary grades, he was bused to a different school once a week for an extended learning program for advanced students. He attended Sparks Jr. High in La Puente where he took advanced classes and continued to do well academically.

La Puente has long had notoriety as a gang infested community where teenagers are at risk for recruitment into one of the local street gangs.  Drug use and violence were commonplace in the neighborhood where Felix grew up.  As a precautionary measure, his parents made sure to keep him off the streets at all times by having him deeply involved in sports.  His mother also stopped working outside the home while he was in his teen years so she could spend more time with her children.

In 1992, Felix graduated from La Puente High School where he played both baseball and football.  He kept up his grade point average while taking honors and advanced placement classes.  After graduating from high school, Felix attended a

semester of community college at Mt. San Jacinto College in Menifee, California,

where he was recruited into the U.S. Armed Services.

## C.    Mother's Death

On October 28, 2014, Felix's mother, Maria Cisneros was diagnosed with Stage

4 pancreatic cancer.  She was 68 years old at the time and her health had appeared to

be within the normal range for someone of that age.  Though retired from commercial

janitorial and cleaning work, she still did babysitting.  Her daughter Heydee began

noticing that Maria's eyes were yellow so she took her to a doctor who initially

diagnosed her with pancreas insufficiency.  After further medical tests, it was

determined that she had cancer which had spread to her back and other organs.  Maria

was released from the hospital on November 7, 2014.  Felix took on the responsibility

to care for their mother and Maria came to live with he and his family.

Maria Cisneros passed away in Felix's home before she could begin

chemotherapy treatments.  Felix and his family were emotionally shocked by his

mother's rapid decline and unexpected death.  He had been emotionally prepared to

care for his mother while she would begin receiving several rounds of chemotherapy,

but she did not survive long enough.  According to his family, Felix was emotionally

distraught for many months following his mother's death.

## D.    Marriage and Children

Felix met Veronica de Casas in La Puente.  She was raised in the same

neighborhood as Felix; her family lived only one block away from his.  Although

Veronica and Felix attended the same schools, and Felix had been a childhood friend of Veronica's brother, they did not begin dating until after high school.  On July 26, 1997, Felix and Veronica were married in Los Angeles County.

In his appended letter, Felix's co-worker and friend Ricardo Villagrana adds:

> Felix is someone I look up to and see as a role model and
> know that his integrity is never in question.  Felix works
> hard for his family, and working seven days a week
> didn't matter to him, as long as he could provide and give
> them the opportunity to focus on their goals to be
> successful in life.  Felix has always set a good example
> for family and shown them that hard work and focus does
> pay off. Although they work as a team, Felix is heavily
> involved with guidance, planning, and teaching, not only
> for his wife and kids, but for friends, family, and even
> strangers. I've seen the impact this case has caused on
> Felix and his family and I know how devastating and life
> changing it would be for them to be apart.

Felix and Veronica have three children.  Their son, Felix Cisneros III, age 23, graduated from the University of California at Berkeley in 2020 with a degree in Economics and Finance.  Felix III is now employed in tech sales for a company in Los Angeles.  He lives with his aunt and paternal grandfather in La Puente, but returns to his mother's home every weekend.  Their daughter, Lauren, age 21, attends West Coast University in Ontario, California where she will earn a nursing degree in two more years.  While Lauren was attending Riverside Community College, she was employed at an adult living facility.  Lauren is currently working as a travel CNA nurse.  Their younger daughter, Alessandra, age 19, has started her second year at Riverside Community College where she will major in psychology.  Just as her sister

did, Alessandra works in an adult living facility where she provides care to the elderly.

Both Lauren and Alessandra live with their mother in Murrieta, California.

In her letter (attached), the defendant's daughter, Lauren Cisneros states:

> I am writing this letter in regards to my father, the absolute most important person in my life. My father is my biggest role model, supporter, and best friend. He is one of the most hardworking, intelligent, and well-rounded people who has not only inspired myself but as well as those around him. When thinking of what a father figure should be like, what do children normally think of? Putting a roof over their head? Supporting them? Feeding them? Those things are roughly the norm and many people are content with that, which is great, however, growing up, I have been blessed with so much more. My father has done nothing but go over the top for myself and my family. We are his main priority and his greatest blessing and he does not let us forget. With that, as a daughter, there is nothing more I could ask from him. The little things he does for me are what I cherish the most. His actions towards me have not only been inspiring but have molded me as the lady I am today.

By every account Felix Cisneros has been a loving and supportive husband and father. All three children attended St. Jeanne de Lestonnac Catholic School in Temecula from kindergarten through 12th grade. Felix volunteered to direct traffic in the school parking lot every morning before work. He and Veronica would also chaperone their children's field trips and school events. Although he worked long hours, Felix always made time for his children and gave back to his community.

Between 2001 and 2020, Veronica worked providing licensed child care services in their family home in Murrieta. She was licensed to care for children from

infancy to age 14.  Veronica often cared for two, four, or up to six children at a time, and she sometimes employed another person to help her.  Felix also underwent and passed the child care licensing background check, and he was able to help out his wife in the daycare center as needed.

Often, parents who were seeking child care services wished to interview Felix as well as Veronica to see what type of home environment their children would be in. Felix would always make himself available for these interviews.  He would also help with the school drop-offs and pick-ups of their three own children, and he would go to his job from there.

Currently, Veronica is attending Cal State University Los Angeles where she is one class away from obtaining her degree in Social Work.  She has been employed as a domestic violence counselor for YWCA of the San Gabriel Valley since December 27, 2021.

## IX.
## THE FACTORS AT 18 U.S.C. §3553(a)
## AND THE CURRENT STATE OF THE LAW ARE IN
## CONFORMANCE WITH THE REQUESTED SENTENCE OF 41 MONTHS

Under the principles established in *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are now, of course, purely advisory.  The Guidelines are one among a number of factors that courts are directed to assess in imposing a sentence that is "sufficient, but not greater than necessary" to achieve the purposes set forth in 18 U.S.C. § 3553(a)(2).  Neither § 3553(a) nor *Booker* suggests that any of these factors is individually paramount.  All of them, however, are

controlled by § 3553(a)'s mandate to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing.

Numerous appellate decisions from various circuit courts have clarified the role and approach of the sentencing court in the post-*Booker* era.  The Ninth Circuit has held that "Booker empowered district courts, not appellate courts...[and] breathe[d] life into the authority of district court judges to engage in individualized sentencing." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008).  The Ninth Circuit has also determined that in weighing the sentencing decisions of a district court, the proper standard is abuse of discretion, and it will not "second guess" the court's conclusions so long as they are reasonable.  *United States v. Menyweather*, 447 F.3d 625, 633 (9th Cir. 2006).

Further, the Seventh Circuit has stated that post-*Rita* "[t]he District courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. §3553(a) without any thumb on the scale favoring a guideline sentence.*" United States. v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007) (citing *Rita v. United States*, 551 U.S. 338 (2007)).

As part of the sentencing algebra, in addition to weighing the "history and characteristics of the defendant" and the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(2) directs U.S. District Court judges to consider the need for just punishment; the need for deterrence; the need to protect society; the need to provide

- 33 -

defendants with necessary educational and vocational training; and the need to avoid

undue disparity among similarly situated defendants.

## A.    Just Punishment

Based on the totality of the factors, including the defendant's contrition and the

aim of avoiding undue disparity, the requested sentence of 41 months incarceration

would constitute just punishment in this matter.  The dual overlapping prosecutions

and trials, which have stretched out over a period of more than five years, and the year

of imprisonment already served before he learned that he was to be indicted again for

what is essentially the same common scheme and course of conduct, has cast a long

shadow over Felix's life and that of his family.  By all accounts, he has displayed

fortitude in the face of mounting collateral damage; he now has his career, reputation

and personal finances in ruins.  His family has exhausted their savings to keep afloat

financially through this ordeal.  His three young adult children have faced stress and

risked loss of their primary caregiver and emotional cornerstone; it is a credit to them

that they have not been derailed and have continued to work, while pursing higher

education and careers.  Yet Felix Cisneros' life will never be the same.  He has

suffered a downfall and pubic disgrace which, though of his own making, is no less

painful.  He will never work in law enforcement again; indeed, as a twice-convicted

Federal felon and ex-convict in his fifties, he will struggle to obtain any form of

meaningful and adequately-remunerated employment.  Given the manifold

punishments that have already begun, and will continue in waves into the future,

ample retribution can be imparted without the need to imprison him a second time for a protracted period.

## B.   Deterrence

Deterrence has two parts, specific (or individual) and general (or societal).  To the extent general deterrence is effective, anyone considering illegal activity, especially a law enforcement officer, would likely think twice knowing that they would be facing any period of imprisonment and a long subsequent term of Supervised Release, accompanied by intensive and intrusive oversight with the consequence of a return to prison if they fail to adequately perform.  This is further reinforced by the loss of vocation and career; the banishment and ostracization from the close-knit law enforcement fraternity to which nearly all of Felix's life-long friends belong; and a substantial money judgment order and restitution that will take years for him to pay off, if ever.

With respect to individual deterrence, it is evident based on his remorse and self-correction since the termination of his illegal behavior in 2017, that Felix Cisneros does not need to go to prison for an excessively long term to deter him from future criminal conduct.  The impact of these two Federal prosecutions on Felix Cisneros can hardly be exaggerated.  It has been jarring to him, and his family has experienced palpable anguish for over five years.

Mr. Cisneros is not criminogenic by nature.  To the contrary, he has, as the numerous letters submitted on his behalf indicate, always demonstrated the highest

- 35 -

degree of responsibility for his family and concern for his community.  The risk of

him ever re-offending is essentially non-existent.

       The government seeks a draconian sentence of ten or twelve years for the

ostensible purpose of general deterrence.  But for any similarly situated individuals

within Mr. Cisneros' professional world, the mere fact that he was prosecuted

federally in the first place, lost his professional career and licensing, and that his life

as he once knew it has been turned upside down, will provide more than ample

deterrence to any temptation to participate in an offense such as this one.

Realistically, nothing will be accomplished by a sentence of 10 years that could not be

achieved equally well by 4 or 5 years imprisonment, in terms of deterrence.

       The bribery incidents that gave rise to Mr. Cisneros' prosecution occurred long

ago.  There is substantial evidence that even relatively short sentences can have a

strong deterrent effect on prospective white collar offenders.  Indeed, white-collar

"offenders are not committed to a lifestyle of illegality, are risk-averse, and have more

to lose as a result of criminal conviction than street offenders."  Elizabeth Szockyj,

*Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998).[1]  White collar

offenders "are more likely to be deterred, even by selective enforcement and modest

penalties; such offenders have many lawful alternatives and much to lose from being

convicted, regardless of the penalty."  Richard Frase, *Punishment Purposes*, 58

---

[1] Available at:
https://heinonline.org/HOL/LandingPage?handle=hein.journals/siulj23&div=32&id=&page=

Stanford L. Rev. 67, 80 (2005).[2]  Felix Cisneros certainly falls within this category of defendant who presents a low risk of reoffending.

**C.    <u>Societal Protection</u>**

There are unquestionably cases where incapacitation is necessary to protect the public from further crimes on the part of predatory defendants.  This is not one of them.  Mr. Cisneros is 48 years old and a father of three.  He was a law enforcement officer for 20 years and before that served honorably in the U.S. Military.  Prior to this latest sad chapter, Mr. Cisneros had no contacts with the criminal justice system.  His offense was entirely non-violent.  Not only does Mr. Cisneros not pose a danger to others, but conversely, as documented by the letters submitted on his behalf, the extensive acts of compassion and volunteer work to which he has been committed throughout his life have done much to alleviate the suffering of others.

**D.    <u>Rehabilitation</u>**

While the educational and developmental programs that the BOP has to offer [i.e., obtain "correctional and vocational treatment," § 3553(a)(2)(D)], are surely beneficial to some defendants, rehabilitation is not a significant concern in the case of Mr. Cisneros.  Mr. Cisneros has a solid and long-established work ethic, is educated, does not abuse alcohol or illicit substances, and is well-established in his family and community life.  He stands at the center of a stable nuclear family comprised of his wife Veronica and their three children.

---

[2] Available at:  https://www.jstor.org/stable/40040252

As evidenced by the letters of reference submitted by neighbors, friends and family, the greater community of which Mr. Cisneros is a contributing member stands by him and remains stalwart in support through this time of crisis and beyond. Mr. Cisneros' positive accomplishments of recent years contrast with his mistakes of 2015-2017 and show the degree to which he has matured.  It is submitted that lengthy incarceration at this point, for a crime committed years ago by a man who has obviously changed greatly in the interim, would amount to "beating a dead horse." Not only would such a sanction contribute nothing to the rehabilitation that Mr. Cisneros has already achieved on his own, but it would be counterproductive to his community which has benefitted from Mr. Cisneros' helpful and generous spirit.

**E.    Avoidance of Unwarranted Sentence Disparity**

18 U.S.C. § 3553(a)(6) references the need to avoid unwarranted sentencing disparities.  For an offender such as Felix Cisneros, a prison sentence of 3-4 years for this offense would in no way represent undue disparity in favor of the defendant. Quite the opposite, a sentence even remotely approaching double digits would be unjustifiably disparate with the sentences imposed on related defendant J.B. and likely to be imposed on E.S., as well as some of the comparable recent Central District sentencings cited earlier in this memorandum.

It is understood that the facts germane to a particular defendant are unique, and may vary from case to case.  However, Mr. Cisneros' conduct, while serious, did not involve inordinate amounts of financial damage, and the § 3553(a) factors which

otherwise might weigh in favor of a more protracted punishment have largely been

rendered moot by the earlier prosecution and prison term already imposed and served,

and by the many years that have elapsed between the actual occurrence of the offense

and today.

## X.
## CONCLUSION

Felix Cisneros' financial debts and pressures and his contact with other corrupt

individuals does not excuse his criminal conduct.  After 20 years in law enforcement,

he should have known better than to accept loans that could be construed as bribes or

gratuities in exchange for running queries in law enforcement databases or providing

parole letters.  But it should not be overlooked that for many years he was a dutiful

and responsible soldier, border patrol agent, and investigator who contributed to the

protection and safety of our society while incurring personal risk and sacrifice in the

process.

Thus, when the Court now considers what constitutes a reasonable sentence

under the factors set forth at § 3553(a), we respectfully point to the Supreme Court's

admonition that "the punishment should fit the offender and not merely the crime."

*Pepper*, 562 U.S. at 487-88. In light of his many positive personal characteristics, his

prior unblemished record as a law enforcement officer, his excellent work history, his

dedication to his family, his contrition, his successful rehabilitation of the past few

years, and the extreme unlikelihood that he will ever reoffend, we respectfully ask the

Court's consideration and mercy.

1  Given the totality of the factors, it is submitted that justice can be effectuated by

2
3  a sentence of not more than 41months, with a downward variance to reflect credit for

4  the prior prison time already served (12 months and 1 day).  Such a sanction, followed

5  by an appropriate period of Supervised Release with whatever retributive, restorative

6
7  and rehabilitative conditions the Court deems warranted, would be "sufficient, but not

8  greater than necessary" to serve the ends of justice and fulfill the sentencing aims set

9  forth at 18 U.S.C § 3553(a)(2).

10

11  Date: October 5, 2022                          Respectfully submitted,

12                                                 MGDESYAN LAW FIRM

13

14                                                 /s/ *George G. Mgdesyan*

15                                                 GEORGE G. MGDESYAN
                                                   Attorney for Defendant
16                                                 FELIX CISNEROS, JR.

17

18

19

20

21

22

23

24

25

26

27

28